USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/14/2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
B.M , *individually and on behalf of E.M.*, :
:
Plaintiff, : 12 Civ. 3247 (JMF)
:
-v- : OPINION AND ORDER
:
:
NEW YORK CITY DEPARTMENT OF EDUCATION, :
:
Defendant. :
:
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     Plaintiff B.M. brings this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, challenging the education program offered by the New York City Department of Education ("DOE") to her son, E.M., a student with autism. B.M. asks this Court to vacate the decision and order of the New York State Review Officer and award 960 hours of special education tutoring as compensatory relief for the DOE's alleged denial of a free appropriate public education to E.M. For the reasons discussed below, Plaintiff's motion for summary judgment is DENIED, and Defendant's cross motion for summary judgment is GRANTED.

## THE STATUTORY SCHEME

     "Congress enacted the IDEA to promote the education of students with disabilities." *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08 Civ.8051 (TPG), 2010 WL 3398256, at *1 (S.D.N.Y. Aug. 27, 2010). The statute requires any state receiving federal funds to provide disabled children with a "free and appropriate public education ('FAPE')." *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012). To that end, school districts are

required to "create an individualized education program ('IEP') for each such child" with disabilities. *Id.* at 175 (citing 20 U.S.C. § 1414(d); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)). An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* (internal quotation marks omitted). An IEP must be "reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted).

In New York, Committees on Special Education ("CSEs") — composed of the student's parent or parents, a regular or special education teacher, a school board representative, a parent representative, and others appointed by the local school district's board of education — are responsible for developing IEPs. *See* N.Y. Educ. Law § 4402(1)(b)(1); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998). When doing so, a "CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175. To comply with its substantive obligations under the IDEA, a school district must provide "an IEP that is likely to produce progress, not regression." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).

Although the IDEA outlines both procedural and substantive requirements for IEPs, *see* 20 U.S.C. § 1414, it "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130. If a parent believes that his or her child's IEP is not compliant with the IDEA, the parent may file a due process complaint. *See R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1415(b)(6)). If a parent files a due process complaint,

the school district has thirty days to remedy any deficiencies identified in the complaint without penalty. *See id.* at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)). If, at the end of this thirty-day "resolution period," the parent feels his or her concerns have not been adequately addressed, the parent can continue with the due process claim. *See id.* The IDEA then mandates that states provide "impartial due process hearings" before "impartial hearing officers" ("IHOs"). *See id.* at 175 (citing 20 U.S.C. § 1415(f)). If dissatisfied with the IHO's ruling, either party may appeal the case to a state review officer ("SRO"). *Id.* (citing N.Y. Educ. Law § 4404(2)). After exhausting administrative remedies through this process, either party may bring a civil action in state or federal court to review the SRO's decision. *See id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

## BACKGROUND

E.M. was born on October 16, 1996, and is classified as a student with autism. (Pl.'s Resp. to Statement of Material Facts Not in Dispute ("Pl.'s Resp.") (Docket No. 23) ¶¶ 1, 3). As such, E.M. qualifies as a "child with a disability" as defined by the IDEA. In December 2009, an IEP was developed for E.M. (*Id.* ¶ 7). Pursuant to that plan, E.M. was enrolled in a twelve-month school program. (*Id.*). He attended P188@MS310("P188"), a DOE District 75 school for students with disabilities. (*Id.* ¶ 5). E.M. began the 2010-11 school year in a general education classroom with Special Education Teacher Support Services ("SETSS") provided fifteen periods per week, and support from a paraprofessional forty periods per week. (*Id.* ¶ 7). E.M. also received speech-language therapy three times a week, occupational therapy twice a week, and counseling once a week. (*Id.* ¶ 9).

On December 14, 2010, a DOE CSE convened to create a new, superseding IEP for E.M. for the upcoming twelve-month period. (*Id.* ¶ 10). The CSE was composed of E.M.'s mother,

B.M.; an Assistant Principal of P188; E.M.'s SETSS teacher; a guidance counselor; an occupational therapist; and a speech-language pathologist. (*Id.*). The new IEP recommended that the previous IEP be extended an additional twelve months and set forth ten annual goals, each with several short-term objectives. (*Id.* ¶¶ 11-12).

On May 17, 2011, E.M.'s parents filed a due process complaint ("Complaint") asking for an impartial hearing and alleging that the DOE had not provided E.M. with a FAPE for the 2010-11 school year. (*Id.* ¶ 25; Compl., Hearing Officer's Decision, Parent Ex. A ("Compl.")). The Complaint alleged that E.M. was denied a FAPE on nine grounds. (Compl. 2-3). First and foremost, it alleged that the IEP was not appropriate. (*Id.* 2). It stated, for example, that the IEP did not challenge E.M. academically and that the paraprofessional was not working with him constructively. (*Id.*). It alleged that the paraprofessional did E.M.'s work for him and failed to sufficiently monitor him, noting an occasion when E.M. left school in the Bronx and was found by police in Manhattan. (*Id.*). The Complaint took issue with the way E.M.'s teachers handled his negative behavior and alleged that "the mainstream teachers d[id] not seem to have training to work with students on the autism spectrum." (*Id.*).

In addition to alleging an inadequate IEP, the Complaint also alleged that the DOE failed to (1) indicate accurate Present Levels of Educational Performance; (2) develop appropriate goals and objectives; (3) provide required progress reports to E.M.'s parents; (4) provide transitional services or parent counseling and training; (5) conduct a legally compliant CSE; (6) conduct an appropriate Functional Behavioral Assessment; (7) develop a Behavioral Intervention Plan ("BIP"); or (8) properly evaluate E.M. (*Id.* 2-3).

On May 31, 2011, the DOE convened a resolution session to address Plaintiff's

4

allegations. (Hearing Officer's Findings of Fact and Decision ("IHO Decision") 2). At the session, the DOE offered to enter into a resolution agreement in which it would conduct a triennial evaluation of E.M., perform a Functional Behavioral Assessment and develop a Behavioral Intervention Plan. (*Id.*). It was further agreed that "a CSE review would be held to review updated evaluations with full parental participation where the concerns raised in the hearing request would be addressed." (IHO Decision 2-3). At the session, DOE representatives asked E.M.'s parents' advocate to clarify what "corrective services" they sought. (IHO Decision 2; Pls.' Resp. ¶¶ 31-32). According to the IHO, the advocate "refused to make a demand and the issue of corrective services was not further discussed and left to be determined at [the] hearing." (IHO Decision 2). The IHO concluded that "all the substantive issues raised in the parents' due process complaint notice were resolved." (*Id.*).

At a pre-hearing conference held on June 16, 2011, the remaining issues for the upcoming hearing were discussed. (*Id.* at 3). Evaluations had already been conducted, and the CSE meeting was scheduled for July 12, 2011. (*Id.*). The IHO stated that E.M.'s parents were satisfied with the resolution that had been reached and that, according to the parents' attorney, the only remaining issue for the IHO's determination was "whether the student is entitled to corrective services as a result of the parents' claim that services were not provided to the student during the 2010-11 school year." (*Id.*). In order to make that determination, the IHO explained that she must first determine whether the 2010 IEP denied E.M. a FAPE. (*Id.*).[1] Neither party objected to, or further clarified, the IHO's summary of the foregoing events, and the hearing was held on July 5, 2011, and August 22, 2011. (Decision of the State Review Officer ("SRO

---

[1] The IHO actually referred to "the December 14, 2011 IEP." (IHO Decision 3). The Court assumes this was an error and that the IHO meant the 2010 IEP.

Decision") 5).

In their closing brief, submitted after the hearing but before the IHO's decision, E.M.'s parents argued that, among other things, the DOE had failed to offer E.M. a FAPE because his SETSS teacher for the 2009-10 and 2010-11 school years, John Sardo, was not certified to teach special education. (*Id.* at 5). They alleged that this was a "failure to implement the IEP as written." (*Id.* (internal quotation marks omitted)). E.M.'s parents requested an award of 960 hours of "direct education tutoring services, to be provided at [their] discretion, and available for the remainder of [E.M.'s] eligibility for services." (*Id.* at 6 (internal quotation marks omitted)). The award was meant, in part, to compensate for the "losses [E.M.] suffered due to the absence of a certified special education teacher." (*Id.* (internal quotation marks omitted)).

In her November 1, 2011 decision, the IHO concluded that although DOE had "failed to provide [E.M.] with a free appropriate public education during the 2010/2011 school year, any deficiencies were satisfactorily resolved . . . during the resolution period," and "[c]orrective services [were] not warranted." (IHO Decision 18). In finding that the services provided to E.M. in 2010-11 were insufficient, the IHO explained that the staff providing those services were not "knowledgeable in E.M.'s area of disability." (*Id.* at 15). In particular, "E.M.'s special education teacher was not certified in special education." (*Id.* (internal quotation marks omitted)). And E.M.'s guidance counselor was inexperienced with autistic students and thus "ill prepared to meet E.M.'s needs." (*Id.* at 16). The IHO also noted that DOE lacked "updated and valid evaluations in which to determine E.M.'s present level of functioning." (*Id.* at 14).

Nevertheless, the IHO held that corrective services were unwarranted. The IHO explained that "[t]here [were] too many inconsistencies in [E.M.'s] parents' presentation of their

case to find a need for corrective services." (*Id.* at 16). For example, E.M.'s mother testified that "she was concerned about the inclusion program" because she thought E.M. was unhappy, but when given the opportunity to send E.M. to another school, she refused "because he was happy and did not want to leave his friends." (*Id.* at 16). The IHO also expressed concerns about the testimony of E.M.'s parents' expert witness, Dr. Vicki Sudhalter, who diagnosed E.M. with Aspberger's, because she "could . . . not identify the criteria" for that diagnosis and because she "admitted that she ha[d previously] made that diagnosis with students" who did not meet the criteria "in an attempt to have [them] mainstreamed." (*Id.* at 10-11). In addition, the IHO noted that E.M. "clearly seemed to benefit" from the 2010-11 program. Finally, she concluded that the deficiencies identified in the due process complaint were remedied during the resolution period, when DOE agreed, among other things, "to provide a comprehensive evaluation" of E.M. and to "address[ ] the crucial need for staff training." (*Id.* at 17).

E.M.'s parents appealed the IHO's decision to New York's Office of State Review, arguing that it was error for the IHO to deny E.M. compensatory services. (SRO Decision 7). The DOE cross-appealed the IHO's finding that E.M. was denied a FAPE. (*Id.* at 8). On February 10, 2012, an SRO dismissed the parents' appeal and sustained the DOE's cross-appeal in part. (*Id.* at 15). The SRO held that because E.M.'s parents raised the issue of the SETSS teacher and guidance counselor's lack of qualifications for the first time in their closing brief, the IHO had "exceeded her jurisdiction in predicating her conclusion that the district failed to offer [E.M.] a FAPE . . . upon th[o]se grounds." (SRO Decision 11). The SRO explained that "[a] party requesting an impartial hearing may not raise issues at the impartial hearing that were not raised in its original due process complaint unless the other party agrees or the original . . .

7

complaint is amended prior to the impartial hearing." (*Id.*).  Accordingly, the SRO annulled that portion of the IHO's decision.  (*Id.* at 13).  The SRO explained, however, that even if the IHO had had jurisdiction to consider the SETSS teacher and guidance counselor's qualifications, "the evidence in the hearing record would not support a finding that the district failed to offer [E.M.] a FAPE . . . based upon this procedural violation."  (*Id.*).

## DISCUSSION

### A. Standard of Review

Summary judgment motions in the context of the IDEA involve "more than looking into disputed issues of fact."  *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).  Instead, they are a "'pragmatic procedural mechanism' for reviewing administrative decisions."  *Id.* (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005).  The Court in such cases conducts an "'independent' judicial review."  *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982)). The Supreme Court has explained, however, that conducting an independent judicial review is not an "'invitation . . . to substitute'" the Court's "'own notions of sound educational policy for those of the school authorities they review.'"  *Id.* (quoting *Rowley*, 458 U.S. at 206).  The "district court must base its decision on the preponderance of the evidence," but it must also "give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks and brackets omitted).  "Deference is particularly appropriate whe[re]," as here, "the state officer's review 'has been thorough and careful.'"  *R.E.*, 694 F.3d at 184 (quoting

*Walczak*, 142 F.3d at 129). Nevertheless, the courts do not "simply rubber stamp administrative decisions," *id.* (internal quotation marks omitted), and they may consider additional evidence not presented in the proceedings below, *see* 20 U.S.C. § 1415(i)(2)(C).

When a state's decision under the IDEA is challenged in federal court, the court "conducts a review of both the procedural and substantive adequacy of the underlying decision." *B.O. v. Cold Spring Harbor Cent. Sch. Dist. (In re B.O. & P.S.)*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011). First, "courts examine whether . . . the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (internal quotation marks omitted). Second, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks and brackets omitted). While substantive inadequacy automatically entitles parents to reimbursement, procedural violations do so only "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). Procedural violations must be considered cumulatively. *See id.* (citing *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

**B. Administrative Exhaustion**

As an initial matter, Defendant argues that this Court lacks subject-matter jurisdiction to address Plaintiff's challenge to the SETSS teacher Sardo's lack of special education qualifications because Plaintiff failed to raise that issue in her due process complaint. The IDEA provides that the party requesting a due process hearing "shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees

otherwise." 20 U.S.C. § 1415(f)(3)(B).  As the Second Circuit has explained, this requirement is critical to ensure that the "resolution period" in which a school district is permitted to resolve complaints without penalty functions as intended.  *See R.E.*, 694 F.3d at 187-88 & n.4.  After all, in the absence of the requirement, a parent could "sandbag the school district" and "take advantage of a school district . . . that inadvertently or in good faith omits a required service from the IEP." *Id.* at 188 & n.4.  By statute, "[a]ny party aggrieved by the findings and decision made" in a due process hearing then had "the right to bring a civil action *with respect to the* [*due process*] *complaint presented*."  20 U.S.C. § 1415(i)(2)(A) (emphasis added).

Failure to exhaust the remedies provided in this review process, the Second Circuit has long held, deprives a federal court of subject-matter jurisdiction to consider the claim on appeal from the SRO.  *See, e.g.*, *Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 243 (2d Cir. 2008); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995).  A district court, therefore, may only review issues raised in a plaintiff's due process complaint.  *See, e.g.*, *B.P. v. New York City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant."); *M.R. v. S. Orangetown Cent. Sch. Dist.*, No. 10 Civ. 1800 (CS), 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011) ("[T]here is a statutory bar to the IHO considering issues not raised in the demand for a due process hearing, absent the district's or IHO's consent to a timely amendment.  Accordingly, this Court is constrained to conclude that Plaintiffs' request for [relief not requested in the due process complaint] is improper for failure to exhaust administrative remedies." (citations omitted)).

In opposing Defendant's argument, Plaintiff relies on Supreme Court decisions, including *Gonzalez v. Thaler*, 132 S. Ct. 641 (2012), to argue that the exhaustion requirement is a "nonjurisdictional claim-processing rule" rather than a jurisdictional requirement and that Defendant should be deemed to have waived it. (Pl.'s Mem. Opp'n Def.'s Cross-Mot. Summ. J. 1-3). There is considerable force to this argument, which has been accepted by other courts, *see, e.g.*, *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 870-71 (9th Cir. 2011) (en banc), but it is foreclosed by Second Circuit precedent. In fact, even after *Gonzalez*, the Second Circuit has declined an invitation to abandon its prior precedent treating failure to exhaust as jurisdictional. *See Baldessarre v. Monroe Cent. Sch. Dist.*, No. 11-CV-2835, 2012 WL 4039986, at *2 (2d Cir. Sept.3, 2012) (summary order) (stating that "[t]his panel is bound by the decisions of prior panels until . . . they are overruled either by an en banc panel of our Court or by the Supreme Court" (internal quotation marks omitted)). If a panel of the Second Circuit is bound by that Court's prior precedent, *this* Court is certainly bound by it. Thus, unless and until the Second Circuit or Supreme Court holds otherwise, a parent's failure to raise an IDEA claim in his or her due process complaint deprives a court of subject-matter jurisdiction to address the claim.

Applying that rule here, this Court lacks jurisdiction to entertain Plaintiff's claims relating to Sardo's lack of special education qualifications as she failed to raise the issue in her due process complaint. Plaintiff did allege that E.M.'s "mainstream teachers" did not have "training to work with students on the autism spectrum." (Def.'s Mem. Supp. Cross-Mot. Summ. J. 12-13). But that allegation did not suffice to put the DOE on notice of any claim relating to the qualifications of the SETSS teacher, thereby preventing the school district from remedying the claim during the resolution period. Nor is the situation here akin to that in *M.H. v.*

11

*New York City Dept. of Educ.*, 685 F.3d 217, 249-51 (2d Cir. 2012), upon which Plaintiff relies. (Pl.'s Mem. Supp. Mot. Summ. J. 12-13). In that case, the Second Circuit held that by affirmatively making an argument in its opening statement and through its first witness, the school district had "opened the door" to rebuttal by the parents. Here, however, the DOE made no affirmative argument relating to Sardo's qualifications (or lack thereof) to which B.M. needed to respond; it merely elicited the information as part of routine questioning about Sardo's background.

In short, in light of Second Circuit precedent holding that the failure to exhaust an IDEA claim is jurisdictional, the Court agrees with Defendant that it lacks subject-matter jurisdiction to consider Plaintiff's claims relating to Sardo's lack of special education qualifications.[2]

## C. The Merits

### 1. E.M. Was Not Denied a FAPE

In any event, even if the Court has jurisdiction to address all of Plaintiff's claims, they are without merit. On appeal from the SRO's decision, B.M. contends that Sardo's lack of qualifications to teach special education was a "per se" procedural violation of the regulations that resulted in E.M. being denied a FAPE. (Pl.'s Mem. Supp. Mot. Summ. J. 15).[3] She also

---

[2]   As Plaintiff notes, at least two courts in this district have held that a court may consider issues raised for the first time on appeal given that district courts, unlike SROs, are authorized by statute to consider new evidence when reviewing the administrative proceedings below. *See Arlington v. D.K. and K.K.*, No. 02 Civ. 2117 (DLC), 2002 WL 31521158, at *9 (S.D.N.Y. Nov.14, 2002) (citing 20 U.S.C. § 1415 (i)(2)(C)); *M.P.G.*, 2010 WL 3398256, at *8 (relying on *Arlington*). The fact that a court may consider new *evidence*, however, does not mean that it may consider a new *argument* or *claim*. And, in any event, it is hard — if not impossible — to reconcile these decisions with the Second Circuit's holding that failure to raise an argument in a due process complaint precludes later review of that argument (whether jurisdictional or not).

[3]   The decisions of the IHO and the SRO addressed not only the SETSS teacher's qualifications (or lack thereof), but also those of the guidance counselor. In these proceedings, however, Plaintiff has raised no claim with respect to the qualifications of the guidance

argues that E.M. was denied a FAPE because the district failed to provide him with an appropriate BIP; failed to provide parent counseling, training, and transitional support services pursuant to State regulations; failed to convene a properly comprised CSE; inappropriately designated E.M. for alternate assessments; and failed to timely evaluate E.M. (*Id.* at 16-20).

B.M. supports the claim that E.M. was denied a FAPE with two types of evidence. First, she claims that her expert witness, Dr. Sudhalter, offered credible testimony demonstrating that E.M. could not have received a FAPE without a properly certified special education teacher. (*Id.* at 15). Second, she offers her own testimony that "EM's behaviors noticeably deteriorated in the seventh grade," in that, for example, he began to pick things up off the floor and put them in his mouth. (*Id.* at 15-16). She alleges that these problems continued in the eighth grade. (*Id.* at 16). B.M. testified at the hearing that E.M.'s paraprofessional did most of his work for him in class and that his homework assignments were unclear. (Tr. 299-300). She reported that in November 2010, E.M. left school grounds because "he was bored," and was later found in Manhattan. (Tr. 284-86, 301). Finally, she notes in her brief that by the end of eighth grade, E.M. performed math problems at a third-grade level, numeral operations at a 3.5 grade level, and comprehended reading at a 3.2 grade-level, as determined by a Wechsler Individual Achievement Test administered in June 2011. (Pl.'s Mem. Supp. Mot. Summ. J. 19). B.M. argues that the contrary evidence in the record — which suggests that E.M. actually *improved* under the 2009 and 2010 IEPs — is based on the testimony of Sardo who, not being a certified special education teacher, is not qualified "to gauge the progress of a student with special needs." (*Id.* at 16).

The Court is not persuaded by Plaintiff's arguments. As noted above, under the IDEA, the denial of a FAPE cannot be found for procedural violations alone unless those violations "[1]

---

counselor; she objects only to the SRO's holding with respect to the SETSS teacher.

impeded the child's right to a free appropriate public education; [2] significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or [3] caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Here, even taking into account Sardo's lack of qualifications — which the parties agree is a procedural, rather than a substantive, violation of the IDEA (Pl.'s Mem. Supp. Mot. Summ. J. 15; Def.'s Mem. Supp. Cross-Mot. Summ. J. 15-16) — Plaintiff has not made this showing. Indeed, considering the record as a whole, the Court agrees with the Defendant and the SRO that E.M. received a FAPE for the 2010-11 school year. As the SRO noted, Sardo completed coursework in "child psychology" and "differentiating instruction," and he worked with autistic children as a student teacher. (SRO Decision 14 (internal quotation marks omitted)). Sardo also received SETSS coaching and participated in a six-part workshop in the SETSS training program. (*Id.*). Moreover, he "pushed in" to E.M.'s classes to provide "in class support," and tutoring. (*Id.*). The SRO credited — and it is not for this Court to second guess — Sardo's testimony regarding E.M.'s progress, as well as the manner in which Sardo developed and implemented the goals in E.M.'s IEP and BIP. (*Id.*).

Importantly, as the SRO stressed, the "hearing record contain[ed] unrebutted, objective evidence of [E.M.'s] progress in the form of a student report card from the 2010-11 school year, as well as testimony regarding the student's grades in his most recent report card at the time of the impartial hearing, both of which indicate[d] that [E.M.] received passing grades in all of his core academic classes during the 2010-11 school year." (*Id.*). Sardo also testified that he worked with E.M. to address the negative behavior about which B.M. testified (Tr. 73), and E.M.'s school principal testified that E.M. no longer picked up gum from the floor (Tr. 31).

E.M.'s social studies teacher testified that E.M. was a "walking encyclopedia" on subjects that were interesting to him and that he was "particularly attuned towards social studies, recalling facts and details, because he's interested in that sort of information." (Tr. 176). Sardo testified that E.M. was very good with technology and could look things up on the internet and use programs like PowerPoint with little assistance. (Tr. 69).

In addition to this evidence of academic progress, there is evidence that E.M. made social progress. For example, E.M.'s social studies teacher testified that when he first met E.M., E.M. interacted with only one other child, but that he had come to have "a wide circle of acquaintances and dare I say a wider circle of friends." (Tr. 175). B.M. testified that E.M. had a peer group at his school with whom he socialized and ate lunch (Tr. 298-99), and that she declined to transfer E.M. to a different school because E.M. "likes being with his friends," (Tr. 296).

Although Plaintiff's expert Dr. Sudhalter's testimony, if credited, might call some of this evidence into doubt, the IHO found her testimony to be "questionable." (IHO Decision 14). B.M. does not dispute that Dr. Sudhalter had neither evaluated E.M. in the past two years nor reviewed any of his recent progress reports before testifying (*see* Pl.'s Resp. ¶ 40), but she nonetheless invites the Court to put aside the IHO's credibility determination as arbitrary and capricious. (*See* Pl.'s Mem. Opp'n Def.'s Cross-Mot. Summ. J. 8). In light of the strong deference owed to an IHO's determination of credibility, *see, e.g.*, *B.O.*, 807 F. Supp. 2d at 142, the Court declines to accept the invitation.

In short, taking into account the evidence in the record that E.M. functioned well academically and socially in the 2010-11 school year, and giving proper deference to the SRO and IHO in their credibility determinations and assessments of educational policy, the alleged

15

procedural violations — including Sardo's lack of special education certification — are not sufficient to support a finding that E.M. was a denied a FAPE.  *See, e.g.*, *M.S. ex rel. S.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000) (explaining that "[a]n assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience").  There is therefore no basis for an award of compensatory education.  *See, e.g.*, *Somoza v. N.Y.C Dep't of Educ.*, 538 F.3d 106, 109 n.2 (2d Cir. 2008) ("An award of compensatory education is appropriate only for gross violations of the IDEA.");  *French v. New York State Dep't of Educ.*, 476 Fed. Appx. 468, 471 (2d Cir. 2011) ("A plaintiff seeking compensatory education . . . must show by a preponderance of the evidence that she has suffered a gross procedural violation.") (citing *Rowley*, 458 U.S. at 206; *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Ctrl. Sch. Dist.*, 553 F.3d 165, 172-73 (2d Cir. 2009)).

### 2. E.M.'s 2010 IEP Was Adequate

To the extent that B.M. challenges E.M.'s 2010 IEP, her claims also fall short.  As noted, to comply with its substantive obligations under the IDEA, a school district must provide "an IEP that is 'likely to produce progress, not regression.'"  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).   It must also afford

> the student with an opportunity greater than mere trivial advancement.  The services must be provided in the least restrictive setting consistent with a child's needs.  Thus, the education provided must be sufficient to confer some educational benefit upon the handicapped child, but it need not provide[] everything that might be thought desirable by loving parents.

*M.R.*, 2011 WL 6307563, at *5 (internal quotation marks and citations omitted).  The Second Circuit has noted that, "deference [to administrative agencies] is particularly important when assessing an IEP's substantive adequacy."  *Cerra*, 427 F.3d at 195; *see id.* ("We have not

hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer." (internal quotation marks omitted)).

In E.M.'s case, the 2010 IEP recommended that the services outlined in the 2009 IEP be continued.  These included a general education teacher with special education teacher support services, direct support in the general education classroom for five periods per week, direct support in a separate location for seven periods per week, indirect support for three periods per week, and paraprofessional support for forty periods per week.  (Hearing Officer's Decision, Parent Ex. B).  The 2010 IEP also set forth ten annual goals with short term objectives by which E.M.'s teachers could track his progress, and it included a BIP discussing techniques to be employed in an attempt to change and redirect E.M.'s negative behaviors.  (*Id.*).  The IEP included counseling and parent training as well.

"For a federal court to conduct an independent review of a challenged IEP without impermissibly meddling in state educational methodology, it must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan."  *Walczak*, 142 F.3d at 130 (internal quotation marks and citation omitted). Given the evidence in the record already discussed, there is no basis to find that E.M. was not provided with an IEP "likely to produce progress, not regression," *Walczak*, 142 F.3d at 130. Indeed, there was sufficient reason to think the policy implemented in the 2009 plan had been working.  For example, in the 2009 IEP, E.M. was described as reading at a third grade level, writing at a fourth grade level, and solving problems at a fifth grade level.  He was able to write a paragraph on only a single idea and needed a multiplication chart to recall the multiplication

17

tables through twelve. (IHO Decision, Parent Ex. C, at 3). On the 2010 IEP, by contrast, he was described as reading and writing at a fifth grade level, and problem solving at a sixth grade level. He was able to write two paragraphs on a single idea and had "made strides with regard to the multiplication tables up through twelve." (IHO Decision, Parent Ex. B, at 3). Moreover, as discussed above, in the 2010-11 year, E.M. passed all his classes. *See Walczak*, 142 F.3d at 130 ("[W]hen a disabled child is in a mainstream class[,] . . . . the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress.").

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Cross Motion for Summary Judgment is GRANTED. The Clerk of Court is directed to terminate the motions and close this case.

SO ORDERED.

Dated: May 14, 2013
      New York, New York

_____
JESSE M. FURMAN
United States District Judge